# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **BURNICE COLEMAN,** ) | |
| ) | |
| Plaintiff, ) | Case No. 2:04CV00040 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **JO ANNE B. BARNHART,** ) | By: James P. Jones |
| **COMMISSIONER OF** ) | Chief United States District Judge |
| **SOCIAL SECURITY,** ) | |
| ) | |
| Defendant. ) | |

In this social security case, I affirm the final decision of the Commissioner.

*I. Background.*

Burnice Coleman filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for supplemental security income ("SSI") benefits under title XVI of the Social Security Act, 42 U.S.C.A. §§ 1381-1383d (West 2003 & Supp. 2005) ("Act"). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 1383(c)(3).

My review is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, this court's "inquiry must terminate," and the final decision of the Commissioner

must be affirmed. *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

Coleman protectively applied for benefits on January 11, 2001, alleging disability since November 8, 2000, and received a hearing before an administrative law judge ("ALJ") on June 12, 2002. By decision dated October 16, 2002, the ALJ found that the plaintiff was not disabled within the meaning of the Act. The Social Security Administration's Appeals Council denied review, and the ALJ's opinion constitutes the final decision of the Commissioner.

The parties have briefed the issues, and the case is now ripe for decision.

## II. Facts.

Coleman was forty-eight years old at the time of the ALJ hearing. He completed the twelfth grade, with vocational trade training in masonry. (R. at 17.) Coleman has worked as a coal miner, roof bolter, and shuttle car operator. (R. at 18.)

Based upon the evidence, the ALJ determined that the plaintiff is unable to return to past relevant work, but has the residual functional capacity to perform a significant range of light work, as defined in the regulations. Based upon the

testimony of a vocational expert ("VE"), the ALJ found that there existed a significant number of jobs in the national economy which the plaintiff could perform.

### *III. Analysis.*

Coleman contends that the Commissioner's determination is not supported by substantial evidence. Specifically, he alleges that the ALJ: (1) failed to find that the plaintiff meets or equals Listing of Impairments § 12.05C; (2) substituted his own opinion for that of a qualified psychologist; (3) failed to give proper weight to the opinion of the plaintiff's treating physician; (4) failed to afford the plaintiff a full and fair hearing; and (5) has taken actions which constitute a de facto reopening of the plaintiff's prior applications. For the following reasons, I disagree.

*A.*

First, Coleman argues that the ALJ erred when he found that the plaintiff's mental impairments do not meet or equal the requirements of listing 12.05C of the Listing of Impairments ("LOI"). The 12.00 series in the LOI pertains to mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 (2005). Specifically, § 12.05C is the listing for mental retardation. *Id*. § 12.05C. As noted by plaintiff, an individual meets LOI § 12.05C if she has (1) a valid verbal, performance, or full scale

IQ of 60 through 70, and (2) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *See id*.

First, a plaintiff must obtain a verbal, performance, or full scale IQ score between 60 and 70. This requirement is the subject of the plaintiff's argument. Coleman's records contain the results of one IQ test, administered by Dr. Brian E. Warren. (R. at 121-29.) On that test, Coleman was measured as having a verbal IQ of 69, a performance IQ of 69, and a full scale IQ of 66 *(id.)*–scores which would place him squarely within the first prong of § 12.05C.

However, the ALJ rejected the results of Dr. Warren's testing. (R. at 22.) The ALJ noted that Coleman claimed he was mentally retarded in association with two previous applications for benefits, and that assertion was twice rejected by the Commissioner and affirmed by the District Court. (R. at 21.) In his first case, Coleman presented conflicting IQ tests to the Commissioner—one administered by Dr. Steward and the other by Ms. Pantaze. The Commissioner rejected the lower set of scores obtained by Dr. Steward and relied upon the higher scores obtained by Ms. Pantaze. In his second case, Coleman against presented conflicting IQ tests to the Commissioner, this time adding the results of Dr. Warren's testing, which place Coleman's IQ in between the scores obtained by Dr. Steward and Ms. Pantaze. The Commissioner again relied on Ms. Pantaze's scores. As this court explained through

- 4 -

Case 2:04-cv-00040-JPJ-PMS   Document 16   Filed 09/05/05   Page 4 of 14   Pageid#: 85

Magistrate Judge Pamela Meade Sargent on review of that decision, Ms. Pantaze's estimate was more consistent with the other evidence in the record. (*Id*.)

When Coleman filed his current application, he submitted the results of only one IQ test—the one by Dr. Warren. In this case, the ALJ determined that Dr. Warren's scores do not change the Commissioner's previous findings as to Coleman's mental impairments. "If anything," the ALJ explained, "the subsequent testing merely confirms that Dr. Steward's IQ testing scores did not accurately reflect clamant's life-long intellectual functioning." (R. at 21-22.) The ALJ found the results of Ms. Pantaze's testing, which reported a verbal IQ of 78, a performance IQ of 78, and a full scale IQ of 77 (*see* R. at 201), to be the most accurate. Her test results were also most consistent with the opinions of Drs. Milan and Tenison, who opined that Coleman has borderline intellectual functioning, rather than lifelong mental retardation. Relying on Ms. Pantaze's findings, the ALJ determined that Coleman's IQ does not meet or equal the first prong of LOI § 12.05C.

In general, a claimant's second or successive application for disability benefits is treated as a claim apart from those earlier filed and, absent an identity of claims, principles of claim preclusion do not apply. *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 476 (4th Cir. 1999). This rule recognizes that fact that the passage of time can have a great effect on a claimant's physical or mental condition. *Id*.

However, a prior adjudication can in some cases be "highly probative." *Id.* at 477. This is such a case.

It is generally assumed that a claimant's IQ remains relatively constant over his lifetime, absent any evidence of change in intellectual functioning. *See Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989) (citing *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985)). There is no evidence to explain why Coleman's mental impairments may have changed between November 7, 2000, the date on which the Commissioner last denied Coleman's mental retardation claim, and November 8, 2000, the date on which Coleman filed this application for benefits. Nor is there any evidence suggesting that Ms. Pantaze's results are inaccurate; indeed, Coleman does not mention Ms. Pantaze or his previous IQ test results in connection with this argument. Thus, I find that there is substantial evidence in the record to support the Commissioner's conclusion that Coleman's mental impairments neither meet nor equal § 12.05 of the Listings.

In his second, and related argument, Coleman argues that the ALJ improperly substituted his own opinion for that of a qualified psychologist, Dr. Warren. Coleman specifically attacks those portions of the opinion in which the ALJ reported that Coleman had "failed a few classes and . . . failed English in tenth grade," reported that Coleman had held supervisory responsibilities while working in the coal mines,

referred to the reports of Ms. Pantaze and Dr. Steward, and rejected Dr. Warren's opinion as invalid and unreliable. Coleman suggests that the ALJ should not have referred to evidence associated with Coleman's previous claims, and was required to accept Dr. Warren's findings because "the record contains no reports or records from a Ms. Pantaze or a Dr. Steward, nor does it contain school records." (Pl.'s Mot. Summ. J. at 11.) Coleman concludes that because the ALJ relied on information not in the record, he arbitrarily substituted his own opinion for that of Coleman's doctors.

The IQ evidence submitted by Coleman with his most recent application for benefits duplicates that which was submitted with prior applications, minus that evidence the previous ALJs found troubling. A claimant may not edit the medical reports she presents to the Commissioner, removing problematic reports with each subsequent filing until she creates the perfect record in support of her claim. The ALJ is allowed to consider evidence presented in prior claims, particularly when examining an issue such as IQ, which is assumed to remain constant throughout a claimant's lifetime. In this case, the ALJ did not substitute his own opinion for that of Coleman's doctor. Rather, he considered all the relevant available evidence and weighed it appropriately, reaching a conclusion that is supported by substantial evidence.

- 7 -

Case 2:04-cv-00040-JPJ-PMS   Document 16   Filed 09/05/05   Page 7 of 14   Pageid#: 88

*B.*

Next, Coleman argues that the ALJ failed to give proper weight to the opinion of his treating physicians, Dr. Abernathy and his associates at Tri-County Health Clinic. Dr. Abernathy opined that Coleman can lift or carry a maximum of twenty pounds occasionally and ten pounds frequently; can stand or walk a total of two to three hours in an eight-hour day; can never crouch or crawl; can occasionally climb, stoop, kneel, and balance; and has work restrictions for heights, moving machinery, dust, fumes, humidity, and vibration. Finally, Dr. Abernathy diagnosed Coleman with an early cataract in his right eye and opined that his vision is failing. (R. at 261-72.)

An ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining doctors, which constitute a major part of the proof in disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2005). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent

with other substantial evidence, it should be accorded significantly less weight." *Craig,* 76 F.3d at 590.

The ALJ clearly explained, "I give little weight to Dr. Abernathy's opinion because the treatment records do not support it." (R. at 22.) Coleman had no ongoing or intensive treatment plan that would corroborate Dr. Abernathy's opinion, nor did Coleman's daily activities indicate that he was as limited as Dr. Abernathy suggested. In fact, the ALJ pointed out, Coleman's records from the clinic at which Dr. Abernathy works fail to document any problem with dizziness or the ability to walk or stand. Coleman's Tri-County Health Clinic records consisted primarily of blood sugar checks and the prescription of medications for back pain. The ALJ thoroughly explained his reasons for discounting Dr. Abernathy's opinion, as required by the regulations, and accordingly I find that decision to be supported by substantial evidence.

## C.

Coleman also argues that the ALJ denied him a full and fair hearing when the ALJ denied counsel's request for a continuance. Counsel became involved in Coleman's case on May 22, 2002, less than a month before the hearing on June 12, 2002. (Pl.'s Mot. Summ. J. at 11.) For this reason, Coleman argues, the ALJ did not

- 9 -

Case 2:04-cv-00040-JPJ-PMS   Document 16   Filed 09/05/05   Page 9 of 14   Pageid#: 90

have updated medical records and was unable to pose proper hypothetical questions to the VE.

A claimant is entitled to a full and fair hearing, and failure to have such a hearing may constitute sufficient cause to remand the case. *Sims v. Harris*, 631 F.2d 26, 27 (4th Cir. 1980). An ALJ has an affirmative duty to assist the claimant in developing the record fully and fairly, *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986), even when the claimant is represented by counsel. *See Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994). However, an ALJ is not required to act as counsel for the claimant. *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). Ultimately, it is the claimant who bears the burden of establishing a prima facie entitlement to benefits, *see Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir.1981), and a remand is not necessary unless the claimant has been prejudiced by a failure to develop the record. *See Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981) (remand appropriate "where the [ALJ] fails diligently to explore all relevant facts especially in cases of uneducated, pro se claimants and where the absence of counsel appears to prejudice a claimant).

In this case, the ALJ denied counsel's request for a continuance because counsel was informed of the hearing date when he agreed to take Coleman's case, and there were notices of the hearing in Coleman's file. (R. at 297-98.) Nevertheless,

counsel did not request a continuance until after he arrived at the hearing. The ALJ informed counsel that he could submit additional medical records as they became available after the hearing, and proceeded with the hearing. (R. at 298.) Coleman was represented by counsel. He had an opportunity to testify on his own behalf. Counsel was given an opportunity to cross-examine the VE and other witnesses. In addition, Coleman submitted additional medical records before the ALJ issued his opinion and the ALJ considered that evidence (R. at 22), and Coleman later submitted even more evidence to the Appeals Council. (R. at 260-91.) Coleman suffered no prejudice from the ALJ's decision to deny the continuance request.

Coleman further argues that the ALJ was unable to pose proper hypothetical questions to the VE without the benefit of the updated medical records. In order for a VE's opinion to be relevant or helpful, it must be based upon a consideration of the entire record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). Here, the ALJ posed hypothetical questions that took into account Coleman's claims of exertional, as well as non-exertional, impairments. The ALJ's questions incorporated Coleman's own testimony, asking the VE to assume that Coleman "has spells where he breaks down and cried three to four hours at a time," and that "sometimes his pain flares up and he has to stay in bed three days for relief."

(R. at 338.) Furthermore, Coleman's attorney posed his own questions to the VE. (R. at 339-42.) The ALJ posed proper hypothetical questions and did not err in relying on the VE's testimony.

In summary, I find that the ALJ had before him sufficient facts to determine the central issue of disability, and he fulfilled his duty to develop the record. The claimant was afforded a full and fair hearing.

*D.*

Finally, Coleman argues that the ALJ took actions which constitute a de facto reopening of the plaintiff's prior applications. Specifically, Coleman asserts that the ALJ reopened prior applications when he considered evidence contained in those decisions.

A de facto reopening of a prior decision occurs when the SSA, hearing a second or successive application for benefits, reconsiders whether a claimant's previous application should have been denied. *See Cieutat v. Bowen*, 824 F.2d 348, 354 (5th Cir. 1987); *see also* 20 C.F.R. § 404.988(a-b) (2005) (granting the SSA some discretion to reopen a claimant's case, even after that case has otherwise been finally decided by the Commissioner); *McGowen v. Harris*, 666 F.2d 60, 65 (4th Cir. 1981) (explaining that if a prior decision has "been reconsidered on the merits to any

- 12 -

Case 2:04-cv-00040-JPJ-PMS   Document 16   Filed 09/05/05   Page 12 of 14   Pageid#: 93

extent and at any administrative level, it is thereupon properly treated as having been, to that extent, reopened as a matter of administrative discretion").

Although the ALJ in this case did refer to and consider evidence from Coleman's prior applications, he did so only to the extent that the evidence was probative of Coleman's current condition. The ALJ did not reconsider whether Coleman's first or second claims should have been denied. In fact, he specifically so explained in his opinion, stating, "The claimant had previously filed for benefits in March 1994 and May 1999, and was denied each time. Neither of those applications is subject to a reopening in this matter (a moot point as this is an unfavorable decision as well)." (R. at 16.) There has been no de facto reopening of the claimant's prior applications; therefore, this court lacks the authority to consider whether those prior applications were correctly decided. *See McGowen*, 666 F.2d at 65-66 (explaining that reopened claims are subject to judicial review to the extent of the reopening).

*IV. Conclusion.*

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted.

An appropriate final judgment will be entered.

                                           DATED: September 5, 2005

                                           /s/ JAMES P. JONES
                                           Chief United States District Judge